JAMES MAXWELL V. THE STATE.

*No. 7627.    Decided June 25.*

31  119
31  237
32  496
31  119
35  563
35  649
37   17

**1. Argument of Counsel—Duty of Party Objecting to.**—On a trial for murder, where it had been proved without objection on the part of defendant that he was in the habit of cursing and abusing his wife, and had slapped her in the mouth, and that they had been separated for several months, and the district attorney in his closing argument said, "that defendant ran his wife away from home and slapped her in the mouth;" *held*, that no injury was shown, and that even if the declaration had been shown to be objectionable and injurious, the defendant, to avail himself of the objection, should have requested instructions to the jury not to regard the remark—which was not done.

**2. Charge of the Court—A General Exception to, Insufficient.**— It has been repeatedly held by this court, that a general exception to the charge of the court, specifying no particular errors, is entitled to no consideration, and will not be regarded by this court.

**3. Manslaughter.**—To constitute manslaughter, the act must be caused directly by the passion arising out of the present provocation, and the provocation must be one given by the party killed, and not one given by some other person.    Penal Code, art. 594.

**4. Practice—A Charge on a Less Degree only Necessary, when.** It is not every possible phase of a case that may be suggested by any testimony

in the cause that requires a charge of the court. The correct rule is announced in Davis' case, 28 Texas Court of Appeals, 560. Unless the evidence tending to present a less degree of an offense be *so pertinent and forcible* that it might be reasonably supposed that the jury could be influenced by it in arriving at their verdict, a failure of the court to charge thereon would not be ground for reversal in the absence of exceptions.

5. Murder — Self-Defense—Manslaughter.—See facts stated which, in the opinion of the majority of the court, presented but two issues—on behalf of the State, murder; on behalf of the defendant, self-defense—and upon which the issue of manslaughter not having been legitimately raised, objections to the charge of the court in that particular, to the effect that it was stereotyped and insufficient in its application to the facts, will not be considered, the charge being amply sufficient upon the other issues stated. Hurt, Presiding Judge, dissents, and "refers to the record in support of his views."

APPEAL from the District Court of Stephens. Tried below before Hon. T. H. CONNER.

Appellant was indicted for the murder of one W. B. Deshazo, who was his father-in-law. At the trial he was convicted of murder in the second degree, with the punishment assessed at confinement in the penitentiary for seven years.

After the case was first submitted in the Court of Appeals, the judgment was affirmed in a memorandum opinion, as follows: "In so far as the exceptions were taken to the charge on the question of manslaughter, they are not valid or good. In this connection it may be also stated that the State's theory of the killing was murder, and the defendant's was self-defense, and that (self-defense) based upon the combined attack made by the deceased and Ford. The exception of defendant to the charge on manslaughter was too general. The evidence on the part of the State shows, at least, murder in the second degree. The judgment is affirmed."

A motion for a rehearing was filed, and this motion is disposed of by the opinion of the majority of the court, as given below.

Presiding Judge Hurt dissents from this opinion, "and refers to the record in support of his views." This necessitates a reproduction of the entire testimony in the case, as the same appears in the transcript of the record, which we give as follows:

J. F. Ford testified as follows: I was acquainted with W. B. Deshazo. I lived a neighbor to him, and was an intimate friend. He is now dead. He was shot by defendant, and died in May, two years ago, about the 8th of May, 1889, in Stephens County, Texas. On the day he was killed, near 2 o'clock in the evening, I went to his house; found when I got there Leonard Maxwell and young Mahan, to whom I was introduced by Mr. Deshazo. They and Mr. Deshazo were on the front porch when I got there. I knew Jim Maxwell, the defendant, at the time. I did not see him, but Mr. Deshazo told me that he was in the house with the

ladies. After talking a little while, I asked Leonard Maxwell if he was a brother to Jim Maxwell. He replied, that he was. It did not seem to me that he wished to converse. He cut me off so short I said no more to him. After remaining there a short time, I said to Mr. Deshazo, that I wished to see him on some business, and have a private talk with him. He said, "all right, as soon as he could get his shoes on and his hat, he would go with me." We then went out to the lot, where we talked for sometime; do not know how long, as I had no timepiece. While in the lot I told him I was afraid there was going to be trouble, and mentioned how Leonard Maxwell appeared to me. The old man said he reckoned he was ashamed of Jim's conduct towards the family, and maybe that was what made him act strange. As we returned to the house from the lot I saw Leonard Maxwell go to the front of his wagon near the gun. I remarked again to Deshazo I was afraid he was going to have trouble, and called his attention to Leonard's conduct. We started into the gate, and met defendant. I spoke to him, but did not shake hands with him. He said to Deshazo that he wanted him (Deshazo) to look at some horses. That Millie and he could not agree. Deshazo asked Jim Maxwell if he was going to give Millie a horse. Defendant said, "I thought I would do her right." They went out to look at the horses.

I went on in the house, and found Mrs. Deshazo weeping. Defendant's wife, Millie, who was Deshazo's oldest daughter, was also in the room. In a few minutes after I got in there, and while I was in the room where Mrs. Deshazo and Millie, the wife of the defendant, were, which was the north room of the main house, the defendant came in and wanted Millie, his wife, to go out and see the horses. She replied that she did not care about the horses and would not know anything about them if she did. Defendant then remarked, "Millie, it looks like we ought to live together as man and wife," to which Millie made no reply. Defendant then said to me, "Don't you think so, Mr. Ford?" I at first excused myself from giving my opinion. He repeated the request more than once, when I said, "Since you insist upon my opinion, I will say, that if what I have heard is true, I do not think she ought to live with you." I had heard a good many things, but said to him I had heard you were in the habit of cursing and abusing her, and that you slapped her in the mouth for joining the church. Whereupon defendant denied slapping her in the mouth at any time, when Millie said to defendant, "Yes, you did, Jim." Defendant then said, "I did not." Millie again said, "Why, Jim! You know you did." He had his hand on the bedpost, and suddenly, and in an angry manner, drew it back as if to strike her. I thought he was going to strike her. I stepped up to him, caught him by the front of the coat, and said: "Jim, you must not do that; you can not dispute a lady's word in my presence in her own house. If you are going to do that way

you must get out." I then caught hold of defendant and put him out of the house.

When he got out, with one foot on the doorstep, the other on the porch, he said, "Turn me loose." I turned him loose, and he jerked out a pistol and snapped it at me. When the pistol failed to fire, he got hold of it with both hands and seemed to be trying to fix it to shoot. I saw he was going to shoot me, and I ran in the house. Just as I turned I saw W. B. Deshazo coming from towards the gate in the direction of the defendant. Just after I got in the house I heard a pistol shot, and possibly two. Millie was standing near the door, on the inside, looking out. Suddenly she jumped aside and exclaimed, "Oh, Jim, don't!" at the same time slamming the door to. At that instant the pistol fired again on the outside, and the ball came through the door where Millie had stood. If she had stood still it would have hit her. I asked for a gun, and some one showed me where it was. I heard a struggling noise in the yard, as if some one was breathing hard. When I first saw Deshazo after the firing he was lying on the ground, and defendant going toward the gate. As I came out Leonard Maxwell gave defendant a gun, which he had got from the wagon. He got behind the fence and begun to shoot at me. My first shot at him and his third at me occurred about the same time. I then ran in the house again, and was at the mantle piece, trying to find some ammunition, when defendant shot at me again, the ball brushing close to my head and breaking a lamp on the mantle. I think I shot twice at defendant, and he shot at me three times, in the yard. When I had no more ammunition I went out the back door and ran over to Mr. Cunningham's to get a gun and some ammunition. When I returned the wagon of defendant was there with the harness; were left at Deshazo's; but the men and horses were gone.

I saw deceased in the house, lying on the bed, and when he was asked how it occurred, he said he was trying to keep Jim from shooting in the house where Manda and the children were, and that he took hold of defendant and intended to tell him what it would lead to, but defendant did not give him time.

I went over to Deshazo's on the day he was killed, at the request of Mr. Fulbright, for the purpose of talking to him about the defendant Maxwell's children, and to get him, Deshazo, to go and see Jim, and see if he could not get them and have them cared for; and that is what I wanted to talk to him about when I took him off to the lot. Mr. Fulbright had told me that the children were sick and neglected. Mr. Fulbright is akin to Deshazo. This all occurred in Stephen's County, Texas.

Cross-examined: My general business is boring wells. I preach sometimes. I bored a well for defendant six or seven years ago. I stayed at his house while I was digging the well. I know of no cause of enmity between defendant and I. Do not remember how long I was boring the

well.    When I got to Deshazo's on the day of the killing I did not see
defendant until after Deshazo and I came back from the lot.    I saw de-
fendant's children playing in the yard with Deshazo's children, and they
did not seem to be sick, and I was surprised thereat, having heard that
one of them was very sick.

It is not true that I ran in the house and called for the gun before de-
fendant shot the first or second shot.    On the contrary, defendant's first
shot was just as I got in the house after putting defendant out.    I do not
remember to have seen Nannie or Lula Deshazo in the yard during the
difficulty.    I did not tell the witness J. E. Barnes, next morning after the
killing of Deshazo, that when I ran in the house just after defendant
snapped at me that the door was slammed to by Millie, defendant's wife.
I told him just what I have sworn to about that.    I did not tell the wit-
ness Goforth, the evening of the difficulty, and after Deshazo was killed,
near Deshazo's house, that when I met Jim Maxwell I hated him so much
that I would not shake hands with him.    I did not, on the road between
Goforth's and D. Morris', say to Goforth that I would not care so much
about the difficulty if I knew that Deshazo's family would not blame me
for it, or think that I was the cause of it.

I did not state to W. L. Lamar, on a Saturday two or three weeks after
Deshazo was killed, in the gin yard at Wayland, that I tried to get De-
shazo to load his gun and have it ready; that there would be trouble in
a short time; and that Deshazo told me that if I would let the boys alone
they would get through with their business and leave without any trouble.
I did not, at the same time and place, and in the same conversation, state
to the witness Lamar that if my gun had not snapped Jim Maxwell, the
defendant, would never have hurt Deshazo.    I do not remember any
such conversation with Lamar.    If I told him anything, I told him what
I have here sworn to.    I do not remember stating to A. G. Knight, in a
conversation with him at Mr. Hinton's a few days after the difficulty,
when I was telling him about the difficulty, and he asked me what called
Jim Maxwell's attention from Deshazo, that I believed Deshazo caught
hold of him, Maxwell.    If I told him anything it was what I have sworn.
I did not say to J. E. Barnes, at D. Morris' on the next morning after
Deshazo was killed, that when I was out at the lot talking with Deshazo
that I told Deshazo that he ought to take the children from Jim Maxwell
and run him off.

Dr. C. W. Trader, witness for the State:    Saw Deshazo a short time
before he died.    He was wounded in the right side of neck.    The ball
entered the neck a little below and to the right of the protuberance com-
monly called Adam's apple.    It did not enter windpipe or go out at
back of neck, but proceeded through or under the large muscle extending
down the neck as if the muscle had been extended or raised above its or-

dinary position at the time of the shot.   The ball passed out of the neck first above the collar bone and on into the shoulder and out again a little back of and below the point of the shoulder, the same ball causing the four openings.   I do not know that I can give a more accurate description of the wound.   There was another wound entering about midway between the navel and breast; the exit of this bullet was about one-half inch above the crest of right hip.   The right side of the face was badly powder burned.   He died in about an hour after I got there, from the wound in the bowels.   He was conscious of approaching death.   I asked him how he got shot; he answered, it was in trying to prevent a fuss between Maxwell and Ford, or in trying to prevent Maxwell from shooting Ford; don't remember conversation accurately.   He said Maxwell shot him.   Did not consider the neck wound necessarily fatal.   Right side of face was badly powder burned, the grains of powder being blown in the face.   The wound in the neck could have been inflicted by the party throwing his pistol over his shoulder, if the party wounded was behind him and close to him.   It could also have been inflicted if the party wounded was lying on his side or back when the shot was fired.

Charles Terrell, witness for the State:   I came with Dr. Smilser from Ranger to see Mr. Deshazo.   The wounds, as described, were about as described by Dr. Trader.   He thinks the one that went through the bowels came out on the left side of the backbone about left kidney.   When we got there we gave Deshazo between one-fourth and one-eighth of a grain of morphine, and in about two hours gave him another dose, and left three more doses to be given every two hours until he was easy. One-eighth of a grain is a minimum and one-fourth a maximum dose of morphine.   Don't think the wound in the neck was necessarily fatal. The right side of the face was badly powder burned, powder grains being driven into the skin.   I am a druggist.

Mrs. Deshazo, witness for the State:   Was wife of W. B. Deshazo.   He died 9th day of May, 1889, at home, in Stephens County, Texas.   I was at home the 8th, and know defendant, and Mr. Ford.   Have eight children living.   Millie, Nannie, and Lula were all at home on the day my husband was killed.   Millie was defendant's wife, but not living with him, and had not since October before.   She lived with us.   Don't know where defendant lived.   He came to our house after dinner.   Leonard Maxwell and a man who gave his name as Mahan, Millie, Nannie, and Lula were all there at home. · Ford did not come until after they had been there sometime.   Don't know just when he did come, as we were all—that is, myself, daughters, and defendant—in the house.   Jim, the defendant, and Millie, his wife, were in the dining room awhile, with their children.   Then they were on the back gallery awhile.   Jim wanted Millie to sign a deed to their land.   The children were not sick, but were

playing in the house part of the time, and out in the yard part of the time, while they were there.

After Jim, the defendant, had stayed sometime, he asked Millie to go out and look at the horses, and pick out one. She told him she did not care anything about the horses, and would not know anything about them if she did, and to let her father pick out the horse. Jim left, and went out towards the front gate, and after he went out of the house Ford came in the room where Millie and I were. After he had been in there a short time, the defendant returned, and told Millie that her pa said for her to come and pick out a horse herself, and she turned to get her bonnet, when Jim remarked, " I think Millie and I ought to get together, Mr. Ford; what do you think about it?" Ford said he did not know anything about it, and did not wish to express himself about it. Defendant insisted that he should give his opinion, when Ford said, "If you insist on my opinion, and as a man's opinion is public property, I will give it to you. If what I have heard is true, I can not insist that she ought to live with you." Ford then stated that he had heard that defendant had abused and slapped his wife in the mouth when she joined the Christian Church. Defendant said he did not do that. Millie said, " Yes, you did, Jim." Jim said, " No, I did not." Millie replied, " Why, Jim, you know you did;" and Jim looked very angry, and put his hand by his side, and I thought was going to shoot Millie. Ford got up and told him not to do that, that he could not dispute a woman's word in his presence, in her own house, and took hold of him and put him out of the house. Defendant said, " Turn me loose," but Ford did not turn him loose until he got him to the edge of the gallery. As he was putting Maxwell out of the door, I said to Mr. Ford, " Don't have any fuss with him. He has come here prepared for war, and we are not prepared." Just at that time I saw Leonard Maxwell getting the gun from the wagon, and said, " Yonder is Leonard getting the gun now." I did not notice Mr. Deshazo anywhere.

When Ford turned the defendant loose, the defendant snapped a pistol at him, and Ford jumped in the house as Jim was working with his pistol, trying to fix it. The defendant, Jim Maxwell, turned with his pistol in both hands and fired at something. I could not see what he shot at. I was standing just at the side of the door, in the room where Ford was, and could partly see out the door. There was a small room cut off, or on north end of gallery. Ford asked for the gun. Millie was standing by the door. Presently I heard her say, " Oh, Jim, don't!" and saw her slam the door, another pistol shot and a ball passed through the door. It passed through the door, and would certainly have hit her had she not jumped aside. Ford got the gun and went out on the gallery, and he and Jim shot at each other several times; Jim in the yard and outside the fence and Ford on the gallery.

After the shooting was over I went around the back of the house to the north end, and when I got to the corner I met the defendant, with his gun presented. I said, "In the name of God, are you going to kill us all?" when Jim dropped the point of his gun down, and went out to the wagon, and he and the boys with him left shortly afterwards. They jumped on their horses and went off in a fast run. When I went out into the back yard I found Mr. Deshazo lying on his back. His feet were at the step of the gallery and his head towards the gate. I asked him if he was hurt. He said he was killed. He said he went up to keep Jim from shooting Ford, and that he turned around and shot him, and that he did nothing in the world to cause Jim to shoot him.

Cross-examined: I remember the justice of the peace, Riley Hodge, coming there the next morning and asking us about the difficulty, and talking of getting out a writ for Leonard Maxwell. I did not state to him, when asked if we were in a position to see any part of the difficulty, that we were all in the house, and did not see anything until all the shooting was over. At the same time and place, and in the same conversation, I did not tell Justice Hodge that I was in a different room from Ford and could not see what was going on outside, where Deshazo and defendant were. Nor is it true that, when defendant returned into the room, Millie, Ford, and I were seated close together in close conversation. Millie (defendant's wife) and Nannie Deshazo left the house sometime during the difficulty. I do not know exactly at what time they left. They went up to Mr. Cunningham's and did not return until after the difficulty was over.

Miss Nannie Deshazo, witness for the State, testified as follows: I am acquainted with the defendant and Fletcher Ford. I am a daughter of deceased, W. B. Deshazo, and sister of Millie Maxwell, defendant's wife, and Lula Deshazo, a witness in this case. I was at home on the day of the killing. Defendant and Leonard Maxwell, his brother, and young Mahan came together to our house that day. Defendant brought his children with him in the wagon; all of us went out to meet him and his children at the gate. They got to our house about 1 o'clock, I reckon; it was after dinner. They had been there sometime before Mr. Ford came. Defendant was in the house talking to Millie. I heard something said about a deed, but do not remember what it was. I went out on the gallery from the south room, where I heard Ford say he must not dispute Millie's word, and he must go out. When Ford got defendant out I heard ma say, "Don't have any fuss; they have come for a fuss and prepared, and we have nothing to fight with. There is Leonard now getting out his Winchester." I looked up and saw Leonard getting out a gun. Defendant threw his head back over his shoulder, and saw Leonard, and then jerked out his pistol and snapped it at Ford. Ford jumped

back into the house.  My father then came up from behind defendant and barely touched him, when defendant instantly whirled and shot my father.  My father had nothing on earth in his hands, and did nothing to the defendant, more than I have stated.

Defendant went around the house at the north end, and was gone a minute or a minute and a half, and I had started to my father—just in the act of stepping off the porch—when defendant returned, approaching from the north, and went up and put his pistol in three or four feet of my father, as if to shoot.  I screamed, and told him not to shoot.  He turned his head and grinned at me, and turned and fired right at my father's face.  It was powder burned, and his shirt was afire.  My father was lying on his back, and the pistol was not over three or four feet away from his face when defendant fired.  I was at Cunningham's house when defendant and Leonard Maxwell left.

Cross-examined:  Ford was doing nothing when defendant snapped his pistol at him.  I was near the door, within twelve feet of defendant.  I stood there quietly.  The time defendant looked around to see Leonard, Leonard was on the ground, with the gun, beside the wagon.  Did not notice Leonard any more, nor see what Mahan done.  Did not notice Ford go into the house when defendant snapped at him.  I was looking at pa, who, about the time Ford got into the house, came up and merely got hold of the tail of defendant's coat, just enough to attract his attention, when defendant turned and fired at my father, shooting him in the stomach.  When the second shot was fired at my father, he was lying on his back, feet to the east, head to the west, and defendant came up on the north side of him.

After defendant shot the second time, Ford came out of the house with gun.  Defendant shot at Ford twice, and then Ford shot.  This was the first time Ford shot.  When Ford and Maxwell were shooting at each other I was standing on the ground in the front yard, near my father, some six or eight feet away from the range of the bullets as they passed from Ford to Maxwell, and from Maxwell to Ford.  I was right smart confused.  Defendant shot at Ford three times, and Ford shot at defendant twice.  I then left and went to Mr. Cunningham's.  No one was with me when I left.  Millie came soon after.  Lula did not come to Cunningham's at all.  There had been no trouble of any kind on the place before Ford put defendant out of the house.  Defendant and his wife, Millie, had been together by themselves part of the time after he had come there.  I did not hear the defendant ask Millie to go back and live with him, except when he asked her to go and look at the horses.  Don't know what they were talking about while together, except I heard something about a deed.  The gun was up in the rack, on the left side of the door as you went in.  Ford had been at our house a number of times; was well acquainted with the house and the effects in it.

Just as Ford and the defendant quit shooting I started around the north end of the house, and by the time I got around I saw defendant about the southeast corner of the house, he having come around the south end. I went on to Mr. Cunningham's. I heard no more shooting after I left the front yard. ' Millie came to Cunningham's after I did, getting there a few minutes after I did. Mother had not come out to my father at the time I left. Did not see defendant and those with him leave. The children's clothes were in the trunk in the wagon.

I do not remember telling Riley Hodge, justice of the peace, the next morning, in the dining room at our house, that I did not see any of the difficulty. I did not, at the same time and place, remember telling him that I was in the back part of the house, where I could see nothing of the difficulty, and that I left for Cunningham's about the time the difficulty begun. I did not, at that same place and in the same conversation, or at any other time when he was there, remember his asking me about the facts of the difficulty and what I knew about it, tell him that I was at the front door, or on the front gallery, or in the front yard, or any other place where I could see any part of the difficulty. I do not remember having any conversation at any time with Hodge about it.

T. M. Collie, witness for the State, testified as follows: I knew W. B. Deshazo. I had known him for twelve years. I met him frequently. Was not related to him. I was present after he was wounded and before he died. He was in his right mind and realized his condition. Said it was not necessary to send for a physician; that he was going to die. In answer to a question by Fulbright, what he had done to Jim Maxwell to cause Jim to shoot him, he answered he had done nothing. He then said his time was mighty short, that he would be better off, and asked all to remember him. He then died in a few seconds.

Cross-examined: My recollection is, the wound in the stomach entered in line with the navel and about an inch to the left. That ball, I don't think, came out. If it did, I did not see where it came out. The statement that he made about Maxwell, as I have related, was made just a few minutes before he died. I do not remember to have seen Hodge, the justice of the peace, there that night. Besides the wounds in the neck and bowels, that I have described, there was also a slight wound on the under side of the left arm, as if a ball had just grazed the arm. I do not know how much morphine had been given up to that time. Do not remember that he took any. He was in his right mind.

L. S. Fulbright, witness for the State, testified as follows: The day before the killing I went to Ranger. I saw defendant a day or two before, at his camp on his farm; had no tent; his wagon was at a tree. This was on Monday before the killing on Wednesday. Defendant had his effects in the wagon, which was covered. Defendant was working in

new ground when I got there.   We went to his camp to see his children. I asked him to let me take his children home with me; that my folks had never seen them.   Defendant would not let them go.   He said he had lost his wife in going over that road, and it seemed to him they were trying to get his children.   Defendant said his children were not well.   They did not look well.   They were dirty and needed attention.   I saw Mr. Ford that day or the next day, and requested him to go over and see Mr. Deshazo and get him to get Jim (meaning the defendant) to let Deshazo take the children over to his house, and let Aunt Manda (Mrs. Deshazo) take care of them until they would get well.   The defendant and I are some kin.   I was present with Mr. Collie just before Deshazo died.   Mr. Collie was holding his hand, and I was standing behind Collie, with my hand on his shoulder, and I asked Deshazo if he did anything to Jim Maxwell to cause him to shoot him.   He said, "No; that Jim was about to shoot brother Ford, and I guess he would have done so if his pistol had not have snapped.   I was just going up to tell him not to shoot, when he turned and shot me before I said a word."   I don't think that Deshazo said that Jim took hold of him.   Don't remember whether Deshazo's face was powder burnt or not.   I was at Deshazo's the night before he was killed.   I did not try to get Deshazo to take the children from defendant.

R. M. Cunningham, witness for the State, testified:   I knew W. B. Deshazo.   I live at this time, and did live at the time he was killed, about 300 yards from his house.   On the day of the killing I was plowing about 300 yards from his house.   I heard a pistol fire when I was turning at the end of the row.   I turned and had gone about fifteen or twenty steps when I heard another shot just like the first; they were pistol shots.   In a short time guns began firing right along; heard nine or eleven in all, I think.   The next shot after the first two sounded like a Winchester and shot gun, but can't say which was first, shot gun or rifle; one was sharp and clear, the other dull.   I plowed on toward the end pretty fast.   Then I saw Nannie Deshazo running to my house.   I first saw Nannie Deshazo, and then Millie Maxwell, defendant's wife.   I then went to Deshazo's.   Mrs. Deshazo and Lula were there.   Mr. Deshazo was on a bed, on the floor of the room.   Neither defendant nor companions were there.   Mr. Deshazo was in his right mind.   He said he was killed.   Deshazo said Jim shot him twice.   Said that defendant had snapped his pistol at Ford's breast, and he (Deshazo) went up to tell him what it would lead to, when defendant shot him in stomach.   Said that defendant was on edge of the porch at the time.   That he then went off and in a moment or two returned and would have shot him (deceased) in the face but that he turned his head, and Jim shot him in the throat.   Deceased's collar button was cut out by the ball.   In a day or so after,

found Leonard Maxwell's hat southwest of the house some two or three hundred yards.

Cross-examined: He said, yes; Leonard told me his horse pitched and he lost his hat. I was about 350 yards from the shooting. It was about 3 o'clock in the evening. It was common for people to be strolling in that neighborhood. I don't remember ever before noticing the time which elapsed between two shots. I thought it about long enough between the two first shots for a person to shoot at a spot on a tree, walk to look at shot, walk back, and shoot again. Nannie Deshazo was at my house when I got there, before I went to Deshazo's. When I first saw her she was in 50 yards of my house. Don't remember that I heard any shot after I saw her. When shots ceased I was within 15 or 18 steps of the end of the row. I saw Miss Nannie Deshazo before I got to the end of the row. She was then 250 yards from Deshazo's, her father's, house. Heard deceased, Deshazo, state after I got there, that defendant had snapped his pistol at Ford, and he went up and grabbed at the pistol under defendant's arm, and defendant turned and shot him. Ford got to my house just as I was leaving for Deshazo's. There was a large gun at my house. I did not see Ford take it away, but it was gone when I got back. We had a warrant for defendant, hunted for him four or five days, but could not find him. We had a warrant for Leonard Maxwell also.

J. J. Douglass, witness for the State: I was sheriff of Stephens County when Deshazo was killed. I made no effort to catch Jim Maxwell. I was busy, and heard that parties were scouring the country for him, and was soon afterward assured that he would soon come in. Defendant came in voluntarily and surrendered on June 22, 1889.

Cross-examined: Defendant came in and surrendered. I understood that Ford had worked up great excitement in the neighborhood, and as soon as excitement subsided defendant would come in and surrender. I refused to give Ford any papers to go after defendant.

The State offered capias for defendant and returns filed May 28, 1889, showing defendant was not found.

First witness for defendant, J. D. Alligree, being duly sworn, testified as follows: I am acquainted with the defendant, James Maxwell. A day or so before Deshazo was killed I purchased his place, on condition that his wife would sign the deed. I was to give him stock for the place. I saw him with his wagon, Leonard Maxwell, Mahan, and his two children on the road to Deshazo's on the day of the killing. He said he was going to get his wife to sign the deed. I never got the place, as she did not sign the deed.

A. G. Knight, sworn for the defendant, testified: In a few days after Deshazo was killed I had a talk with the witness Ford, at Mr. Hinton's, in which he, Ford, stated to me that he believed Deshazo caught hold of defendant the time he was shot.

H. W. Morris, sworn for the defendant, testified: That at Ford's house, when he stayed all night with Ford, a short time after Deshazo was killed, Ford stated to him that he, Ford, went to Deshazo's to get him to take the children from Maxwell; that when he got to Deshazo's house he found Maxwell, the defendant, there, and that he took Deshazo out about the lot, and while out there he tried to get Deshazo to go to the house and load his gun and have it ready; that there was going to be trouble there directly. That Ford said that he could not make Deshazo believe there was any trouble; that Deshazo said that Jim Maxwell had not come there for any trouble, and that there was no danger.

Witness Morris further testified: "That at the same time and place, and in the same conversation, the witness Ford stated that he took deliberate aim with his gun at Maxwell, and that he, Ford, was satisfied that he hit Jim Maxwell, and that he believed that he was then in the woods wounded."

Mrs. Conway, sworn for defendant, testified: That she knew defendant, Jim Maxwell; that he passed by her house and stopped on the day of the killing; said he was going to Mr. Deshazo's to get Millie to sign some land deeds, and that he would divide everything with her. He had his little children, Leonard Maxwell, and Mahan, and his effects in his wagon. It was about 12 or 1 o'clock in the daytime when defendant passed the house of witness.

F. L. Dupree, sworn for defendant, testified: In May or June, just after the killing, at Ford's house, the witness Ford stated to him that he advised Deshazo to go and load his gun with buckshot; that those boys were there for trouble. That Ford told witness that he could not make Deshazo believe it, but that Deshazo said there was no danger of the boys making trouble; they were not there for that purpose. At the same time and place, the witness Ford stated to the witness Dupree that he put Jim out of the house and off the gallery, and that Jim snapped his pistol at him, and he ran in the house after the gun, and that he shot twice at Jim Maxwell. And at the same time and place, the witness Ford stated to this witness that he ran for the gun, and before he could get it he heard two shots in a second or two of each other. And after the second shot, he heard a peculiar noise, and he thought that perhaps Jim Maxwell was crazy and was shooting his own children.

W. L. Lamar, witness for defendant, sworn, testified as follows: That the witness Ford, on a Saturday two or three weeks after the difficulty, in a conversation in the gin yard at Wayland, said that he (Ford) tried to get Deshazo to load his gun and have it ready, for there would be trouble there in a short time, and that Deshazo told Ford if he would let the boys alone they would get through with their business they came to attend to and leave without any trouble; and at the same time and place,

and in the same conversation, witness Ford told this witness Lamar that if his (Ford's) gun had not snapped that Jim Maxwell would never have hurt Deshazo.

Witness W. H. Goforth, for defendant, sworn, testified: That on the evening just after the difficulty in which Deshazo was killed. a short distance south of Deshazo's house, the witness Ford told witness that he went to Deshazo's to get him to take the children from Jim Maxwell (defendant); he said that he told Deshazo that Jim and the boys with him had come there for trouble. Deshazo said there was no trouble in the boys, that he knew Jim (defendant) had nothing against him, and that Jim (the defendant) had brought his children to see them.

Witness further stated, that the witness Ford, at the same place and in the same conversation, stated to this witness that he met Jim Maxwell in Deshazo's yard near the gate, but that he hated him so much that he would not shake hands with him. That Ford, at the same time and place, told this witness that he heard Jim Maxwell ask Deshazo to go and look at the horses and pick out one for Millie; that he (Jim) had agreed to give her one; and that he (Ford) was in the house talking to Mrs. Deshazo and Millie, the latter being the wife of defendant, when Jim came in and said, "Millie, your papa says for you to come and pick out the horse yourself." And Ford, at the same time and place, said to the witness, that Jim Maxwell remarked to his wife that he thought they ought to quit their foolishness, and live together again as man and wife, and Jim (defendant) turned to witness Ford and asked him if he did not think so. That witness Ford stated to this witness that he said in reply to Jim (defendant), that "If what I have heard is true I do not think she ought to live with you." That witness Ford said that he had heard that defendant had slapped his wife in the mouth for joining the Christian Church; that defendant denied it. That the witness Ford told this witness that when defendant denied it his wife said, "Yes, you did, Jim," and defendant said, "Millie, you know I did not;" when the witness Ford said he jumped up and said to the defendant that he could not dispute a woman's word in his presence, and caught the defendant by both arms and began putting him out of the house, and that Jim (defendant) tried to get loose, but he held him the tighter.

At the same place, in the same conversation, this witness says that when he ran in the house to get the gun, he heard one shot, and in a short time he heard another, the two shots being very close together. That he hallooed to the women folks and asked them for a gun. And the witness Ford further stated to this witness that he (Ford) shot at Jim Maxwell. This witness further stated that in a conversation with the witness Ford, between D. Morris' and his (Goforth's) house, on the evening after Deshazo was killed, that he would not care so much about the difficulty **if**

Deshazo's family would not blame him for it, or think that he was the cause of it.

On cross-examination, Goforth said he "did not visit the Deshazos. Lived in one-quarter of a mile of them, but did not neighbor with them. Don't think I have been to Deshazo's in two or three years before the killing."

J. E. Barnes, witness for the defense, stated, that the witness Ford, in a conversation with him, Barnes, at D. Morris' the next morning after Deshazo was killed, said that he, Ford, told Deshazo on the morning before Deshazo was killed, while he and Deshazo were out at the lot together, that he, Deshazo, ought to take the children from Jim Maxwell and run him off. He said that Deshazo stated that he and Jim Maxwell had nothing against each other, and there would be no trouble between them. The witness Ford, at the same time and place, stated to this witness that when he put the defendant out of the house and off the gallery, and defendant jerked out his pistol and snapped at him, that he, Ford, was very much surprised. That he did not have any more fear of him than he did of one of his boys. That the witness Ford, at the same time and place, said that when Jim snapped at him, and just as he turned to run in the house after the gun, and defendant's wife slammed the door to, he saw Deshazo coming rapidly from the direction of the gate, up behind Jim Maxwell, and that very soon, before he could get the gun, heard two shots in quick succession, and after the second shot he heard a peculiar noise, and looked out and saw Deshazo lying on his back in the yard, near the steps.

J. C. Taylor, witness for the defendant, sworn, says: That he, witness, had a conversation with the witness Ford, in his garden at Wayland, about ten days after the trouble at which Deshazo was killed, and that the witness Ford said that he was surprised when Jim Maxwell snapped his pistol at him, because up to that time he had considered Maxwell a coward, and did not believe he would shoot a man. That Ford, at the same time and place, further stated to this witness that he could not persuade Deshazo that Maxwell would hurt him. The balance of the conversation is not as you state it.

I. H. Thomas, witness for the defendant, testified as follows: That he was at Deshazo's house on the evening after he was shot, and that Deshazo was lying on the bed, and he was in the room with him. Deshazo seemed to be suffering greatly, and he heard him say, as if communing with himself: "Law, law, if I had only thought and not run up and took hold of him."

A. N. West, witness, testified: That he was at Deshazo's on the evening after he was shot, and Deshazo stated to him that he, Deshazo, was a dead man. That he said to Deshazo that he hoped not, and Deshazo said he could not see where he had any hope. That he could have none,

or words to that effect.   He said he asked Deshazo how it happened, and Deshazo replied that Ford and Jim Maxwell got into a racket, and Ford put Jim Maxwell out of the house, and that he, Deshazo, went up behind Jim Maxwell and took hold of him without speaking to him.   Deshazo said he reckoned he did wrong in taking hold of Maxwell without speaking to him; Jim may have thought that he, Deshazo, was helping Ford to get away with him.

Dr. J. B. Salmon, witness for defendant, testified as follows:   That he is a physician and surgeon, and has been practicing for sixteen years. That he has had considerable experience with gun-shot wounds.   That he did not see the wounds in Deshazo, but that he heard the testimony of Dr. Trader, a State's witness, who had examined the wounds on Deshazo's body, and described them on the witness stand.   That the wound on Deshazo's neck and shoulder was made by one bullet, and, in his opinion, could be readily inflicted by a man shooting backwards over his right shoulder, if the party wounded was behind the party shooting, and had hold of the party shooting, and was holding him.   That the burn on Deshazo's face with powder, as described by Dr. Trader, could not have been done without the party shooting had the pistol near Deshazo's face at the time it was fired.   That the wound in the neck and shoulder, as described by Dr. Trader, with the ball taking the course described by him, could not possibly have been inflicted upon Deshazo while lying down, by a party standing up in front and shooting.   That a party holding a pistol three feet from the face of Deshazo, when it was fired, could not have powder burned Deshazo's face, as it was described by Dr. Trader, unless from a very large pistol or gun.   That if a party was standing on the ground and Deshazo was lying on the ground, and the party had shot Deshazo in the neck, as described by Dr. Trader, the ball would have gone out at the back of the neck, and not have penetrated the shoulder, as described.

Cross-examined:   He said, "It was true that there was no absolute certainty in the direction a ball would take after entering the body."

R. J. Hodge, a witness for defendant, testified:   That he was at Deshazo's house on the evening of the homicide, and found quite a crowd of people there.   That he was justice of the peace of that precinct, and issued a warrant for the arrest of Jim Maxwell.   That he was a particular friend to Deshazo and family.   That Mrs. Deshazo requested him to go after Jim Maxwell.   That he told them that the declarations of Mr. Deshazo should be reduced to writing.   It was suggested that I then take such statement, but Mr. Deshazo was in so much pain that I told them I would wait until he got easier.   I then went down to Bob Maxwell's, brother to defendant, to look for and try to capture defendant.   That before he started he told them at Deshazo's that he would be at a certain place, where they could find him.   That if Mr. Deshazo got worse to send for him at once, as he wished to reduce his dying declarations to writing.

They did not send for him, and when he got back to Deshazo's next morning he found him, Deshazo, dead. That on the morning after Deshazo was killed he was at Deshazo's, and talking of getting out a warrant for Leonard Maxwell, and as a justice of the peace was trying to get information as to the particulars of the difficulty, as he wished to issue warrants for the arrest of Leonard Maxwell and Mahan, two young men who were at Deshazo's with Jim Maxwell when the difficulty occurred. That the witness, in the dining room at Deshazo's house, on the morning after the homicide the evening before, talked with Mrs. Deshazo and one, if not both, of her two daughters. Don't know which one. That they all at that time stated that they were back in the house and saw no part of the difficulty, except Miss Lula stated that after the second shot she saw her father fall. That Mrs. Deshazo stated that she was in the other room from the one in which Ford was during the difficulty. None of them stated that they were about the front door or on the front gallery during the difficulty.

Cross-examined: He said, "Yes, I took complaints against Leonard Maxwell on the testimony of these ladies."

Leonard Maxwell, witness for defendant, testified as follows: I am a brother of the defendant. I was present at the time of the difficulty at Deshazo's, on the 8th day of May, 1889. On that morning, while out hunting some mules, I met my brother hunting horses. He said he had sold his place if Millie would sign the deed. That he was to get stock for his place; that he wanted to give Millie a horse, or horses, and get her to sign the deed. He wanted a gentle animal for her, and that he might want a grey pony of mine, which was gentle, to let her have, and asked me to go with him to Mr. Deshazo's. We ate early dinner at defendant's camp. Myself, young Mahan, and defendant, with defendant's children, left camp, after eating early dinner, for Deshazo's. Defendant had his bedding and trunk, my clothing, and other of his camp effects, in the wagon. Young Mahan rode horseback, and all the rest of us went in the wagon.

We got to Deshazo's, I suppose, about 1 o'clock; did not have any timepiece. They all came out and invited us in. Jim went into the house. Mahan and myself stopped on the porch, where Mr. Deshazo was lying on the pallet. After remaining there sometime, talking to Mr. Deshazo, Mr. Ford rode up to the gate, got down, and came in. Mr. Deshazo, myself, and Mahan spoke to Mr. Ford when he came on the gallery. After talking awhile, Mr. Ford said to Mr. Deshazo that he wanted to have a talk with him on business, and Mr. Deshazo said, all right, as soon as he could get on his shoes and his hat; and they went off together toward the lot. Mahan and myself remained about the gallery awhile, then went to help Will Deshazo to hitch his horses to the wagon to go after a load of wood.

As there was no person (men folks) outside of the house for us to talk

to, Mahan and I walked around, went down and looked at the tank, and back to the wagon, and lit our pipes and had a smoke, and after we had been at the wagon sometime Ford and Deshazo came back from the lot, and about the same time the defendant, Jim Maxwell, came out of the house and met them near the gate, and defendant asked Deshazo to go out and look at the horses, and pick out one for Millie, as Deshazo was a good judge of the age of horses. Ford went on into the house. Deshazo looked into the horse's mouth, and Jim, the defendant, requested him to select one of them for Millie. Deshazo said he would rather Millie would make her own selection, and for him (defendant) to get Millie to come and make her own selection. Defendant then returned to the house, and went into the house. In a very short time I saw Ford putting defendant out of the house and off the porch. I heard defendant say, "Turn me loose! turn me loose!" Ford pushed him off the porch with one hand, and kept running his right hand as if trying to get it into his pocket, and defendant drew a pistol and presented it at Ford, who then jumped back into the house. Defendant then backed with face toward the door, and had got about half-way to the gate, or somewhere about that distance, when Mr. Deshazo ran up behind defendant and struck him with a club over the head or shoulder, and seemed to try to strike again. The club or stick dropped, and Mr. Deshazo grabbed defendant with both arms and held him till defendant turned his pistol back over his shoulder and fired back at Deshazo, and then twisted like to the left and shot under his left arm at Deshazo, who was still holding on to him (defendant). After the second shot Deshazo dropped loose from defendant.

Ford had got back on the gallery with a gun before defendant shot Deshazo, and fired at defendant just about the time defendant shot Deshazo the first time. As soon as Deshazo fell, defendant backed towards the gate, and Ford, running out again on the gallery, shot at defendant and defendant at him. They then shot several times at each other. I saw the three girls of Deshazo's get over, or fall off, the back fence, going toward Cunningham's about the time the shooting began. No ladies or girls were on the front gallery or in the front yard during any part of the difficulty. Defendant remained in the house and on the back gallery with the women from the time we got there until he came out and met Ford and Deshazo at the gate. When we were on the front porch I heard him laughing and talking in the house. When we were helping Will Deshazo to hitch the horses to the wagon, out by the lot, I saw the defendant and Millie out on the back porch, talking to each other. There had been no disturbance of any kind until after Ford came to Deshazo's.

Cross-examination: Mahan came from Arkansas with defendant and myself. I think he ran off from his father's to come to Texas. I have not seen him since a few days after the difficulty. I do not know where he now is. Can not tell where and how the gun was fastened in the

wagon, as I did not fasten it. I think it was on the second or third wagon bow from the front, below the top of the bed. There was bed clothing, a trunk, clothing, and some other things, in the wagon. The gun was a Winchester, 38 calibre, and was in a scabbard. Think I went to Eastland sometime before; don't know whether I bought cartridges or not; know I bought no 38 cartridges, for that was not the size of my gun. I owned a gun, but left it home on that morning. I don't know the size of defendant's pistol; think it was 44. I got the gun out of the wagon, and Deshazo ran up and hit defendant over the head with a club. It, the club, looked like a piece of split timber about two and a half or three feet long; don't know whether it was a piece of rail or not. Don't remember to have seen any holes in it. When Deshazo struck defendant over the head it sounded like it was a hard lick; it was about as big as that table leg. The table leg is about two inches in diameter. I think Deshazo used both hands in hitting him. Defendant's back was at Deshazo when he struck him, and defendant was not looking toward Deshazo.

I was close to, and in front of, the wagon, and in front of the yard, where I could see distinctly. I could see Deshazo plain. He was between where I was and where defendant was at the time the lick was struck. I think they were about half-way between the gate and the porch, but can not say for certain. I never measured it, but I think it was some twelve or fifteen steps from the gate to the porch. Can't say how far exactly defendant was from porch when Deshazo struck him, but he was about half-way. I reckon it was as much as six steps; it might have been more or less. Deshazo was close enough to hit defendant with the stick. Can't say what defendant did immediately after first lick. Looked as if he was sorter addled; staggered around like, then went to shooting Deshazo loose from him. Defendant shot with his pistol. I think he got it out of his pant's pocket. He got it out of his right pocket. I think defendant had his coat on. Ford shot just about the same time defendant made his first shot at Deshazo. If there was any difference, Ford shot first. Defendant and Deshazo were scuffling at that time; defendant was then between Deshazo and the house.

Ford did not hit me nor defendant, that I know of, during the time of the difficulty. Mahan was at southwest corner of yard. Ford started back in the house, I guess about the time of defendant's second shot at Deshazo. Can't say that defendant shot Ford as he ran in house. After this Ford was in and out so much, and there was so much confusion, I can't tell how the balance of the shooting took place. First I saw of Mrs. Deshazo was after all the shooting was over. She came to bring Mr. Deshazo some water.

After the difficulty was over we all took the harness off the horses and went off fast. My horse pitched and I lost my hat, and I went on bareheaded to neighbor Bobs. I did not stop to get my hat. Got it a day

or two afterward.   Got there, I suppose, about one hour of the sun.   As I was not acquainted along the road I do not know what houses we passed. We all stayed together about one hour.   Jim then left us and went into a thicket.   During the difficulty Jim got the gun from me about the gate. He jerked it from my hands.   I had taken it from the wagon.   I did not shoot any person; don't think defendant was ever on porch after the difficulty began.   There were three girls falling over the fence, and went off east toward Cunningham's.

Redirect:  I did not tie the gun to the wagon bows.   Saw girls, Nannie and Lula, daughters of deceased, just about the time of the first shooting, getting over the back fence and run through the field.   Saw them no more after that.   They were not on the gallery or in the yard at any time during the shooting.

G. H. York, sworn for defendant, testified:  That he lives in the northwest corner of the county.   That he knows defendant, and defendant came to his house about daylight on Friday morning, May 10, 1889, and witness saw blood on defendant's face, and a small cut above his right ear on his head; the wound was about three-fourths of an inch long.   It was just cut through the skin, so as to bleed a little.   It looked as if he had been struck with something.   He stayed but a very short time, did not eat anything, and soon went in the brush.   I live about two and one-half miles this side of where Mr. Jones, the father-in-law of defendant's brother, lives.   This was all that occurred between us.

The defendant, sworn in his own behalf, testified:  About four months prior to the difficulty in which Deshazo was killed, he returned from Arkansas with his children, to his farm in the southern part of the county. That his place and dwelling house were rented out.   He camped on his place, using his covered wagon to shelter himself and children and his camp effects.   He began clearing some ground and planting a patch of cotton.   Some of his brothers went to Oklahoma, and he wanted to go with them.   That he sold his place to old man Alligree for some stock, the sale being conditioned that his wife would sign the deed.   On the morning of the difficulty he met Leonard Maxwell, his brother, hunting stock. I told him about the sale, and traded with him, conditionally, for a gray pony, which was gentle, as I might need him to give to Millie, my wife, as some of my horses were not gentle, and I wanted her to have none except gentle horses.   I asked Leonard to go with me and take the pony along, which he did.   Mahan was working for me at the time, and as I had nothing specially for him to do at camp, and was going to move my camp down near Bob Maxwell's, my brother, on that evening, where we, myself and brothers, intended to remain in camp until we gathered our stock to start for Oklahoma.   We had early dinner at our camp, put all our bedding, camp effects, clothing, etc., that were not already in the wagon, with the children, in the wagon.   Leonard and I got in the

wagon, Mahan rode a horse, and we all started for Deshazo's. We arrived there sometime about 1 o'clock; not certain, had no timepiece.

When we got there, Mrs. Deshazo, Millie (my wife), the young ladies, and Mr. Deshazo came out to the fence to meet us, and invited us in. We tied the horses to a tree with the lines and went in. Mahan and Leonard Maxwell stopped on the gallery with Mr. Deshazo, and I went into the house with the ladies. We remained there sometime, Millie and I being alone with the children part of the time; and I said to her, when we were on the back gallery and the children were playing in the back yard, that if she loved those children as well as I did, she would come and live with them and take care of them. She said she was willing to do what was right about it. While we were sitting in the back room talking, I saw, through a window, a man ride by towards the front of the house. At that time I did not recognize who it was. I knew afterwards that it was J. F. Ford. Everything had gone along pleasantly; and as I wished to get down to my brother's that evening, I told Millie what I had come for; that I wanted to get her to agree to sign the deed, and if she would not live with me I would divide the property with her. I told her I had some horses there, and for her to come out and make a selection of the ones she wanted. She said she knew nothing about horses, and for me to tell her father to select the horses for her. As I went out, when I got on the front gallery, I saw Ford and Deshazo coming from the lot, and Ford seemed to be talking earnestly to Deshazo; they were walking very close together. I met them near the gate; spoke to Ford, and went to shake hands with him, but he refused to shake hands with me, and appeared to be angry. I told Mr. Deshazo what Millie said, and he and I went to the horses to examine them. He looked in their mouths, and we talked some little time about the horses and their ages. Deshazo said he preferred that Millie (defendant's wife) should make her own selections, and told me to go into the house and tell her to come out and do so. I went at once in the house, and found Ford, Millie, and Mrs. Deshazo, her mother, in close conversation. I said to my wife, "Millie, your pa says for you to come out and pick out your own horse." Millie then got up, and turning to her mother, said, "If nothing else will do him, I reckon I'll go with him." I then said, "I think that I and Millie ought to quit our foolishness and live together again; don't you think so, Mr. Ford?" Ford said, "You ask for my opinion, and opinions are free. I don't think you ought, if what I have heard is true. I heard that you slapped Millie in the mouth for joining the Christian Church." I replied that I had not done so. Millie then said, "Yes, you did, Jim." I replied that "I never slapped her in the mouth." Ford jumped up in an angry manner and seized me by each wrist and said, "You can't dispute a woman's word in her own house in my presence," and began to shove me out of the house. I said, "Turn loose, turn loose, turn me

loose !'' but he held me and pushed me roughly until I was just about off the gallery, when I said again, " Turn me loose !'' Ford then released my right hand, and continued to hold my left hand with his left hand, and was at the same time trying to get his right hand in his pocket, where I thought I saw the form of a pistol or a knife. While he was holding my left hand and trying to get his right hand in his pocket, I pulled my pistol from my left side and poked it up near him and snapped. At that time I was standing one foot on the ground and the other on the step leading on the gallery. When I snapped at Ford he turned me loose and ran in the house and called for a gun. He returned at once with the gun, and snapped it at me, and just about that time I received a lick over the head from behind, and at once some person seized me from behind and I could not shake the party off. I threw my pistol over my left shoulder and shot to the rear. When the pistol fired, the party seemed to seize me tighter. Just as quick as possible I stuck the pistol under my left arm and fired again to the rear, when the party turned me loose and fell, and I then saw it was Mr. Deshazo. About the time of my first shot, Ford shot at me from the gallery with a shot gun. Neither Mrs. Deshazo nor either of the daughters of deceased were on the gallery, in the yard, or in sight of us during the difficulty at any time.

About the time Deshazo fell Ford ran again into the house, and I backed out toward the gate. Ford came to the door, shot at me again, and I shot at him with my pistol. I then got on the outside of the yard and got my gun, jerking it out of my brother Leonard's hand. Ford and I shot at each other another time or two, when Ford went out of sight toward Cunningham's, and we took the horses out of the wagon and left. We had no saddles except the one used by Mahan, brother Leonard and myself riding our horses bareback. Brother Leonard's horse got to pitching and he lost his hat. I told the boys that we must get away from there as soon as possible, for Ford, no doubt, had gone to Cunningham's, which was only about 300 yards away, where Ford had a buffalo gun, and if he got in reach of us with it he would kill us. We went in the direction of Robert Maxwell's, my brother's, and I told my brother and Mahan to go on down there; that I was afraid of Ford and his crowd, and it would not do for me to let him and his crowd catch me. I did not anticipate any trouble when I went to Deshazo's. I carried my pistol and my gun with my other effects with me wherever I took the wagon. I had the gun scabbard fastened to the bows, and it had been fastened there for months. I carried the pistol in an old trunk in the wagon, which had no lock to it, and on our way over to Deshazo's the children got into the trunk and I was afraid they would get hold of the pistol, and I took it out and stuck it in the waistband of my pants, on the left side. I had no thought of using it when I did so. I had nothing in the world against Deshazo and we had been friendly all the time.

I would not have shot him if I had not thought it necessary to save my own life.  If my own brother had been holding me under the same circumstances I would have shot him, because I was very much excited at the time, and did not know who he was, and believed that he was helping Ford, who was in front of me with a gun at that time, trying to shoot me.  There was no trouble of any kind at Deshazo's until after Ford came.  They had treated me kindly, and Millie and I were getting along well in the house there together up to that time.  I shot at no one in the difficulty in which Deshazo was killed except Ford and Deshazo, and only shot at them because I thought it was necessary, from their acts and conduct, to save my own life.  I at no time shot at my wife or any other female on the place.

Miss Lula Deshazo, being duly sworn as a witness for the State, testified, in rebuttal, as follows:  I am a daughter of W. B. Deshazo, who was killed.  At the time the difficulty began I was in the south room of the main building, and my attention was attracted by the loud talking in the next room, and Ford's statement to defendant that he must go out. I then walked to the south door and stood in the door, looked and saw Mr. Ford push defendant out to edge of porch.  Defendant said, "Turn me loose," but Ford continued to push defendant, until defendant had one foot on the step and the other upon edge of porch, when defendant jerked out a pistol and snapped it at Ford.  Ford then jumped back, and ran in the room from where they all had been.  Just about this time my father came up from behind defendant, and I think had just touched him, if at all, when defendant wheeled, and with pistol in both hands, shot my father in the stomach.  My father immediately fell back on the ground, on his back, his feet to the east and just about touching the steps to the porch, his head to the west.  Defendant then turned and went off around the north end of the house.  He returned in a few minutes from the north, and coming up to my father, put his pistol close to his face and fired at him again.  In a moment or two, after this, Mr. Ford came back out of the north room with my father's shot gun, and defendant then shot at him, Ford, and Ford at defendant, several times.  Ford again ran in the house, and defendant walked to the southwest part of the yard, and shot through the door at the north room.  There were several more shots fired, but I do not know that I can tell exactly how they occurred.  I am positive that Ford had not shot at defendant or come out on the porch before defendant shot my father the second time.  My father had nothing whatever in his hands, and did not strike defendant at the time, or before defendant shot him.  The shooting was done in the manner I have stated, and not in any other.  Millie, defendant's wife, is now here in attendance on this trial.

Cross-examined, she said:  After the shooting began, I did not notice Leonard Maxwell or Mahan, and do not know what they were doing. I did not leave at all, but remained at the house until after defendant,

Leonard, and Mahan all left. Millie and Nannie, I think, left about the time of Ford's second shot. I was at my father's body when defendant and the others left. They went off rapidly. I heard of no trouble before Mr. Ford came. I remember Esquire Hodge being at our house the next morning; a great many people were there. Think I may have heard some talk about getting out papers to arrest Leonard Maxwell and Mr. Mahan. I do not remember to have had any conversation with Mr. Hodge about it, but I know I did not tell him I did not see any part of the difficulty in which my father was shot, for it is not true.

In the charge to the jury, the court defined homicide, excusable and justifiable homicide, the law as to retreat, and manslaughter, giving the statutory definitions of this latter grade of crime. The charge then defined murder, malice, express malice, and implied malice. It then applied the law as to the facts, to murder of the first and second degrees, announcing the rules of self-defense with reference to the degrees of murder, and the punishment for murder of the first and second degrees, and manslaughter. Instructing upon defendant's right to acquittal on the ground of self-defense and reasonable doubt, and also applying the reasonable doubt as between the degrees of homicide.

We do not deem it necessary to copy this charge in full. The principal objections urged to it, on appeal, were with reference to those portions relating to manslaughter; and though the charge was excepted to, the exceptions were general in their character, and no special instructions were asked. It will be seen from the opinion that a majority of the court hold that manslaughter was not an issue in this case.

*Wheeler & Sebastian* and *Walton, Hill & Walton*, for appellant, on motion for rehearing.

No brief on file for the State; or if so, it has not come into the hands of the Reporter.

SIMKINS, JUDGE.—Defendant was convicted of murder in the second degree and his punishment assessed at seven years, and upon an appeal to this court the judgment was affirmed in an unwritten opinion at the last Austin Term, and is before us on a rehearing. It is only necessary to consider the two questions discussed in the motion for a rehearing.

1. The remarks of the district attorney in his closing speech are alleged to be improper and necessarily injurious to the defendant. The remarks were: " That defendant ran his wife away from home, and slapped her in the mouth."

We do not think the remarks could have injured the defendant. It had gone to the jury, without objection, that defendant was charged by his wife, that he was in the habit of cursing and abusing her, and had

slapped her in the mouth.  That they had been separated since October before.  That defendant had denied the charge of abuse of his wife, and that his wife reiterated the charge before witnesses.  As stated by the court, the defendant was urging upon the jury that the witness Ford was the cause of the separation, and the district attorney was arguing it was defendant's own conduct that led to the separation.  We can not say the argument was, under the circumstances, improper; and if it was, the defendant, to avail himself of the objection, should have requested instructions to the jury not to regard the remarks.

2.  The principal ground urged for a rehearing is on the failure of the court to apply the charge of manslaughter.  The statutory charge was given, but the complaint is, it was a stereotyped charge, when it should have adjusted itself to the facts.  There was a general exception taken to the charge, but such an exception, under the repeated decisions of this court, can not be regarded.  Williams' case, 22 Texas Ct. App., 497.

In the view we take of the case, it is not necessary to consider whether the law on manslaughter was sufficiently charged or not.  We do not think there was sufficient evidence requiring such a charge.  But as presented by the record, it was either self-defense or murder, and the case was fully covered by the charge of the court.

There are two theories presented by the evidence—the State's and the defendant's.  The defendant himself took the stand and presented his defense.  He had been forcibly thrust out of his father-in-law's (deceased's) house, and from the presence of his wife and her mother and sisters, by the man he hated, one Ford.  As he was put off the front gallery he turned and snapped his pistol at Ford, who then fled back into the house and called for a gun.  Ford returned at once with the gun, and snapped at defendant, who was backing to the gate.  Suddenly he received a heavy blow, and at once was seized from behind.  Defendant put his pistol over his shoulder and fired, but felt himself seized tighter; he immediately put his pistol under his left arm and fired on the person holding him, who then loosed him and fell.  Defendant said:  "I then saw it was Deshazo.  About the time of my first shot Ford shot at me from the gallery."  "I had nothing in the world against Deshazo; we had been friendly all the time."  "I would have killed my own brother under the same circumstances, for I was much excited, and believed that Deshazo was helping Ford, who was standing in front of me on the gallery with a gun, trying to shoot me."

Here we have the case from the standpoint of the defendant, and his testimony is strongly corroborated by his brother, who was present and witnessed the whole transaction, and the witness York, who testified to a small cut above the right ear of the defendant next morning, and the witnesses Thomas and West, who swore to the dying statement of Deshazo, who had admitted he had taken hold of defendant and defendant

probably thought he was assisting Ford. If this testimony be true, it was simply self-defense; and the charge of the court is clearly sufficient on this point.

After charging that defendant had a right to defend himself against the unlawful and violent attack of Deshazo, if any was made, the court says: "Or if Ford was making a violent attack upon defendant, or was about to do so, and Deshazo was acting with him, or if appearances were such as reasonably to induce defendant to believe so, and he did believe Deshazo was a party to the attack then made, or about to be made on him by Ford, and defendant killed the deceased to defend himself, then you *should acquit, though deceased may not have used, or attempted to use, any violence upon him;* and in passing on these questions of danger, or apparent danger, it is to be viewed from defendant's standpoint."

The charge put Deshazo and Ford in the same category. If the defendant reasonably believed they were acting together, defendant had the right to kill Deshazo, and it would be in self-defense. It can not be claimed that if defendant did not believe that Deshazo was trying to assist Ford, when he took hold or touched defendant, that defendant would only be guilty of manslaughter in killing him.

In Weathersby's case, 29 Texas Court of Appeals, 278, where the party killed had given no provocation, but was merely seeking to prevent the killing of another, this court says. "The issue of manslaughter is not presented. The act must be caused directly by the passion arising out of the present provocation, and the provocation must be one given by the party killed, and not one given by some other person. Penal Code, 593, 594. It is not every possible phase of the case that may be suggested by any testimony in the cause that requires a charge of the court. The rule is settled in this court by the Davis case, 28 Texas Court of Appeals, 560; and it is thus stated:

"Unless the evidence tending to present a less degree of an offense be so *pertinent* and *forcible*, that it might reasonably be supposed that the jury could be influenced by it in arriving at their verdict, a failure of the court to charge thereon would not be ground for reversal in the absence of exceptions."

As presented by the State, the evidence proved murder. It was testified to by an eye-witness that defendant was standing near the porch, with his pistol drawn. Mr. Deshazo, who had been out at the front gate, came up behind defendant and touched his back, and defendant immediately turned and shot him through the body. Deshazo fell near the porch. Defendant went to the south part of the house, and then returned to where deceased was lying, put his pistol in a few feet of his head, and shot him in the throat.

Deshazo stated to the State's witnesses he had done nothing to induce defendant to kill him; that when defendant snapped his pistol at Ford,

he went to tell him what it would lead to, when defendant shot him in the stomach; that he then went off, and in a moment or two returned and would have shot him in the face, but he turned his head and Jim shot him in the throat. Deshazo was found at the edge of the porch.

The jury evidently repudiated the defense that Deshazo had struck defendant in the head with a club, or had seized him around the waist and arms, and he had shot to free and defend himself. What then remains but that the defendant, touched by Deshazo, had whirled and shot him in the stomach, and then had fired his pistol into the face of the deceased, while he lay on the ground, helpless and dying, at the steps of his own house?

The moderate punishment given in this case, shows that the jury weighed and duly considered all the circumstances of the case. The separation of defendant and his wife, his effort to induce her to return home to her children, the appearance of the intermeddler, Ford, upon the scene, the understanding existing apparently between his wife, her mother, and Ford, his wife's charge of ill treatment, Ford's seizing him in their presence and forcibly ejecting him from the house, the knowledge that the separation was now final—all these facts had rendered defendant reckless and desperate, inducing him not only to try and kill Ford and his wife, but visit his wrath even upon her father. We think the defendant has no right to complain of the verdict. We find no reversible error, and the motion for a rehearing is overruled.

*Motion overruled.*

Hurt, P. J., dissents, and refers to the record in support of his views.